IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

KEITH WILLIAM MOORE,           §
                               §
            Petitioner,        §
                               §
v.                             §        No. 4:13-CV-445-Y
                               §
WILLIAM STEPHENS, Director,    §
Texas Department of Criminal   §
Justice, Correctional          §
Institutions Division,         §
                               §
            Respondent.        §

**OPINION AND ORDER**

Before the Court is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner, Keith William Moore, a state prisoner, against William Stephens, director of the Texas Department of Criminal Justice, Correctional Institutions Division, Respondent. The prior referral to the magistrate judge is withdrawn.

After having considered the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

I.  Factual and Procedural History

In May 2009, in the 213th Judicial District Court, Tarrant County, Texas, a jury found Petitioner guilty of evading arrest or detention using a deadly weapon, a vehicle. It also found enhancement and habitual allegations in the indictment to be true and sentenced him to 30 years' confinement. (J. of Conviction by

Jury 275, Admin. R. ECF No. 13-24.)   Petitioner appealed his convictions, but the Second District Court of Appeals of Texas affirmed the trial court's judgment and the Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review. (Mem. Op., Admin. R. ECF No. 13-4; PDR No. 1762-10.)   Petitioner also filed a state habeas application challenging his conviction, which was denied without written order by the Texas Court of Criminal Appeals on the findings of the trial court.   (Writ of Habeas Corpus cover, Admin. R. ECF No. 13-2.)   This federal petition followed.

The state appellate court set forth a thorough account of the testimony and facts of the case as follows:

> Moore's conviction for evading arrest was based on the following testimony and facts. Several witnesses testified regarding the police's attempt to pull over the truck allegedly driven by Moore, the subsequent police chase of the truck, and the ensuing manhunt that led to Moore's arrest. Because Moore challenges the sufficiency of his conviction, we set forth the witnesses' testimony in detail below.

> **A.   The Police Chase**

> **1.   Officer Honea**

> Officer Nicholas Honea testified that he was on patrol on December 29, 2007, and that he drove by a Motel 6 due to the high volume of criminal activity reported there.   Officer Honea ran a license plate check on a green GM pickup parked in the Motel 6 parking lot, and it came back as stolen.   He reported the location of the stolen truck to other officers and various officers posted themselves in strategic locations to observe the truck and anyone entering it.

> Officer Honea and his partner Officer Banes

positioned themselves in separate patrol cars at a Conoco
station south of Motel 6.   About fifteen or twenty
minutes elapsed and then Officer Banes saw the green
truck driving toward them.   Officers Honea and Banes
followed the green truck; Officer Honea pulled in behind
the truck, and Officer Banes drove down the service road.
According to Officer Honea, both police vehicles turned
on their sirens and their overhead lights, but the green
truck did not pull over.

Officer Honea's lights shone into the back of the
green truck; he observed only one person, the driver, in
the truck.   The driver was wearing a white, fitted
baseball cap with an emblem on the back of it.

The truck's driver stopped at a stoplight, and then
he stepped on the gas and did a 180-degree turn.   The
truck ended up facing Officer Honea.   Officer Honea was
close enough that he "could see the whites of the
driver's eyes."   Officer Honea saw that the driver had
abnormally large ears and was wearing a white baseball
cap, a hoodie, and a white muscle shirt.   Officer Honea's
description of the suspect was that he was "a white white
male."

The green truck's engine revved, and the truck
traveled directly toward Officer Honea's patrol car.
Officer Honea said that he contemplated jumping out of
his vehicle and running because he "was scared of either
sustaining bodily injury, serious bodily injury, and/or
death, whichever would come first" from the impact of the
truck with his car.   As the truck accelerated towards
Officer Honea, Officer Honea completely stopped his
patrol car.   The truck avoided hitting the front of
Officer Honea's patrol car by inches.   Despite the
existence of other avenues of escape, the truck
accelerated into heavy oncoming traffic, which Officer
Honea considered to be deadly conduct.   Officer Honea
said that the driver never made an effort to get into the
correct lane of travel "to prevent anybody else from
being injured from his deadly conduct."   Officer Honea
testified that he was unsure of how many wrecks the
driver caused because he was not the officer who worked
the accidents.

Officer Honea turned around and attempted to catch
up with the driver of the truck. Another officer, Officer
Tyler, announced over the radio that the stolen truck had

3

crashed into a building, and he gave the location. Officer Honea arrived at the crash scene and saw the driver exit the truck, wearing the jacket with the hood flipped up over his head. The driver was wearing white tennis shoes and blue jeans and was fairly pale. The driver fled on foot, and Officer Honea jumped a curb in his patrol car in an attempt to follow him.

A short time later, Officer Vasquez located a man suspected of being the driver of the green truck at a residence on 2305 Irion. Officer Honea went to that address and immediately recognized the person at the scene as the driver of the green truck and identified him; Officer Honea also identified Moore in the courtroom.

Officer Honea learned that a hat and a jacket were found in a grill outside a residence on Irion, and Officer Honea testified that he assumed Officer Banes had found the objects. Officer Honea said that they took pictures of the hat and jacket and gave them back to Moore. Officer Honea put the hat on Moore and said that it was a perfect fit, but Moore would not put on the jacket. Officer Honea said that Moore told him that the hat and jacket were not his.

The officers did not call a fingerprint expert to lift fingerprints from the truck, and they did not call anyone to obtain DNA evidence from the hat or the jacket.

Officer Honea observed the driver of the green truck commit several traffic violations during the chase: Moore failed to yield to emergency vehicles, failed to control speed, drove on the incorrect side of the street, caused several hit-and-run accidents, and hit a building and ran from the scene. From what Officer Honea observed during the pursuit, all of the acts by Moore were intentional acts to flee from the police officers using a vehicle. Officer Honea testified that the manner in which the truck was used by Moore could have caused serious bodily injury or death to other drivers in that area and that it could have caused serious bodily injury or death to Officer Honea and other officers in the area.

**2.   Officer Banes**

Officer Scott Banes testified that on December 29, 2007, he was called by another officer to assist with a

4

possible stolen vehicle.  Although the possible stolen vehicle was found at the Motel 6 at 3271 North Freeway, Officer Banes met up with Officer Honea at a gas station a block south of that location.  On his way to meet Officer Honea, Officer Banes drove by the Motel 6 and saw the possible stolen vehicle, which was a dark green GMC pickup truck with chrome wheels.  When Officer Banes met up with Officer Honea, they discussed their strategy and then saw the stolen vehicle pull out of the parking lot at Motel 6.

Officer Banes and Officer Honea followed the stolen vehicle in their patrol cars and attempted to initiate a traffic stop on the freeway by activating the overhead lights on both of their patrol cars.  Officer Banes did not feel that the driver was evading arrest or detention while they were on the freeway because the driver took the first available exit at Northeast 28th Street.  After exiting, however, the driver did not pull over even though there were safe places to pull over. At that point, Officer Banes started to think that the driver of the truck was not going to stop.

Officer Banes activated his siren three or four blocks south of Northeast 28th Street because he wanted the driver to stop right then.  The driver did not stop but instead overaccelerated and spun around.  The driver sat still for a few seconds and then accelerated the truck and "came flying straight towards Officer Honea['s] . . . patrol car."  Officer Tyler was positioned at the right rear of Officer Honea's patrol car and considered using deadly force against the driver to protect Officer Honea.  Officer Banes testified that, based on the acceleration of the green truck, if the truck had hit Officer Honea's car, the collision could have caused serious bodily injury or death to Officer Honea.

Officer Honea and Officer Banes turned around to follow the green truck, and Officer Banes put out an alert over the radio that the green truck was traveling westbound in the eastbound lanes.  Officer Banes testified that the truck left rapidly, "[H]e floored it"; "[y]ou could hear the exhaust screaming."  Officer Banes testified that the speed limit on that road was forty miles per hour, that he (Officer Banes) was traveling at fifty miles per hour, and that the green truck was pulling away from him "pretty quickly."

Officer Tyler responded to Officer Banes's radio alert and announced over the radio that the truck had attempted a turn onto Grover and had crashed into a building.  Officer Banes saw that the truck had crashed into the building and that there was a "smoldering wreck."  Officer Banes did not see anyone in the truck.

Officer Banes decided to set up a perimeter as other officers began calling out a description of the suspect: a white male, pale skin, thin build, white muscle shirt, and big ears.  Officer Banes eventually heard that a suspect had been detained a block and a half from where the green truck had crashed.  Officer Banes went to that location and saw that there was a suspect in custody who matched the description that had been given over the radio, except that he was not wearing a hoodie and a cap like the broadcast had mentioned.  Officer Banes thought it was odd that Moore was wearing a tank top because the temperature was in the forties.  Officer Banes identified Moore in the courtroom as the suspect that he saw detained on December 29, 2007.

Officer Banes continued the investigation by speaking with a couple who lived at 2305 Irion.  He looked in their backyard and found a black hoodie and a white baseball cap in their barbecue pit.  Officer Banes reviewed the photographs labeled as State's Exhibit 1 and 2 and testified that he was the one who took the photos and collected the evidence that was depicted in the photos.  The fitted baseball hat fit the suspect and was returned to him at the scene.  The defense showed Officer Banes a jacket, but he did not recognize it as the one that he had found on the night in question.  Officer Banes could not recall whether Moore denied ownership of the jacket and baseball cap, but he recalled that Moore accepted them when police returned them to him.

### 3.   Officer Tyler

On the evening of December 29, 2007, Officer Michael Tyler was contacted by Officer Honea.  In response, Officer Tyler went to a Motel 6 at 3271 North Freeway because Officer Honea had found an unoccupied stolen vehicle.  Officer Tyler set up a north perimeter to watch the unoccupied vehicle in case anyone approached and drove it away.

At 6:34 p.m., the vehicle, which was a 2005 green

6

GMC pickup, left the north exit and headed southbound. Officer Tyler notified Officer Honea and Officer Banes, who were set up towards the freeway, that the vehicle was headed towards them.  Officer Tyler saw Officers Honea and Banes pull out behind the vehicle, and he saw Officer Honea turn on the overhead lights on his patrol car. The stolen vehicle failed to stop and kept traveling southbound through heavy traffic.  Officer Tyler saw the stolen vehicle run a red light and fail to stop even though there were numerous places where he could have pulled over.

As the stolen vehicle attempted to turn eastbound onto 28th Street, the driver lost control, and the vehicle spun around 180 degrees; it was facing westbound in the eastbound lanes of traffic.  Officer Honea and Officer Banes also turned onto 28th Street and attempted to block the stolen vehicle in, but the stolen vehicle accelerated and went between them, "real close by Officer Honea's car," and continued westbound in the eastbound lanes of traffic (i.e., going the wrong way).

Officer Tyler took control of the pursuit from there and continued eastbound in the correct lanes of traffic. The driver of the stolen vehicle attempted to turn southbound onto Grover from 28th Street, lost control, and hit the building at 2306 Northeast 28th Street. Officer Tyler saw the driver of the stolen vehicle exit the driver's side of the truck and run southbound on Grover, which is near Irion Street.  Officer Tyler did not see anyone else exit the truck.

After Officer Tyler saw the driver bail out of the stolen vehicle, he pulled in behind the vehicle, confirmed that there were no other people in it, and obtained a description of the driver.  Officer Tyler said that the description of the driver that he put out that night was "[t]all white male, white baseball cap, dark jacket with a hoodie, blue jeans and white shoes." Officer Tyler believed that Moore had on a white shirt under his jacket.  Officer Tyler testified that after the arrest, Moore was not wearing a cap, and Officer Tyler could see that he had a shaved head.

Officer Tyler testified that the following acts committed by Moore constituted dangerous acts that could cause serious bodily injury or death:  running a red light in heavy traffic, losing control of a truck and

7

spinning out 180 degrees in heavy traffic, losing control of a truck and hitting a building, and driving into oncoming traffic during heavy traffic. Officer Tyler further testified that, in his opinion, the truck was used as a deadly weapon—that is, in the manner of its use, it was capable of causing serious bodily injury or death.

### 4.   Officer Vasquez

Officer Jose Vasquez testified that on December 29, 2007, he received a dispatch to respond to Irion Street where two officers were in pursuit of a truck coming from the Motel 6 down 28th Street. Officer Vasquez's duty was to warn drivers to get out of the way because the driver of the truck was going the wrong way on 28th Street and was being pursued by officers. Officer Vasquez's understanding from radio traffic was that Moore had already tried to ram a patrol car and had come close to ramming the police officer. Based on what Officer Vasquez heard over the radio, he responded to the area where the vehicle had "wrecked out." He saw a green pickup had hit a building and noted that it matched the description of the dispatch.

Officer Vasquez had knowledge that the driver of the truck had fled on foot and that he was a white male who was seen wearing a baseball hat. Officer Vasquez started knocking on some doors and driving around the area, looking for the driver.

Officer Vasquez was flagged down by a Hispanic male in the 2300 block of Irion who said that a white male wearing a white muscle shirt had been sitting on the steps of his detached garage. Officer Vasquez said that although the Hispanic male spoke mostly Spanish, Officer Vasquez determined that he was saying that the white male did not belong on his steps.

Officer Vasquez drove in the direction that the witness had flagged him down, went down about two houses, and observed a white male with a bald head and big ears who was wearing a white tank top t-shirt and blue jeans. Officer Vasquez recalled that it "was pretty cold" that night and that it was too cold to be wearing a tank top, which heightened his desire to speak with the individual. Officer Vasquez said that Moore was panting, like he had been running, and that he looked scared. Officer Vasquez

8

approached Moore and asked him if he lived nearby.  Moore
pointed to a house from which a white couple was exiting,
and the couple had a concerned look on their faces.
Officer Vasquez confirmed that Moore did not live there.
On cross-examination, Officer Vasquez testified that the
description he had heard over the radio was a white male,
wearing a hoodie and a baseball cap.  Officer Vasquez
admitted that the man he found was not wearing a hoodie
or a baseball cap.

### 5.   Esmerelda Estrada

On the night of December 29, 2007, Esmerelda Estrada
was in her apartment on Irion Street, lying down with her
baby, when she saw a young man peek through her window
and move the handle of the door to her house.  Esmerelda
told her husband that there was a young man outside and
to go see who it was.  The young man was white and had on
a white sleeveless shirt (like a tank top), which
Esmerelda thought was strange because it was very cold
outside.  She did not see a hat.

### 6.   Antonio Estrada

Antonio Estrada testified that he and his wife were
in their living room watching television on December 29,
2007, when his wife saw someone trying to open the door.
Antonio went outside to see who the person was and saw a
person sitting on the stairs outside his garage.

Antonio described the person as "a white boy," who
was bald headed and was wearing a tank top.  Antonio
asked the boy what he was doing, and he said, "The cops
are looking for me."  Antonio heard police cars going
around the neighborhood and a helicopter flying overhead.
Antonio told the boy "to get out of here," and he left.
Antonio said that a squad car had been sitting nearby,
pointing its lights toward his garage, so the police
immediately caught the boy.  Antonio testified that the
man whom the police arrested was the same boy that
Antonio had seen sitting on the stairs outside his
garage.  Antonio said that he recalled Moore because he
had seen him "face to face."

After the police left, Antonio went out to his grill
and found a hat and a shirt that did not belong to him.
Antonio told the police that he found the jacket and the
hat.

9

### B.   Moore's Mother

Diana Hooper, Moore's mother, admitted that she did not know anything about the offense that Moore was on trial for and that she was testifying because he is her son and because she does not want to see anything bad happen to him.  She testified that Moore was undergoing chemotherapy in December 2007 and that it made him "really, really hot one minute, wanting the air on, to really, really cold, wanting the heat on.  He would go outside without a jacket."  Hooper testified that Moore also experienced shortness of breath and heavy breathing because the chemo made him "really sick."  She said that he "was too sick to do much of anything."  Hooper did not know why Moore would have been hiding in the Estradas' backyard because the side effects from the chemo would not have caused him to wander into people's backyards.

(Mem. Op. 2-14, Admin. R. ECF No. 13-4 (emphasis in original) (footnotes omitted).)

## II.  Issues

On four grounds, Petitioner claims that he received ineffective assistance of trial counsel because counsel failed to: (1) advise him about the correct range of punishment he faced in relation to the offered plea bargain; (2) advance his best defense, investigate or present exculpatory evidence and witnesses, utilize available alibi witnesses, and interview eyewitnesses; (3) correct perjured or false testimony; and (4) object to an improper commitment question asked by the prosecution during voir dire that "allowed for a preconceived notion of guilt by the jurors." (Pet. 7-8, ECF No. 1.)

10

### III.   Rule 5 Statement

Respondent believes that Petitioner has sufficiently exhausted his state-court remedies as to the claims raised and that the petition is neither barred by limitations nor subject to the successive-petition bar.  (Resp't's Answer 12, ECF No. 18.)

### IV.   Legal Standard for Granting Habeas-Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA).  *See* 28 U.S.C. § 2254.  Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court.  *See* 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter,* 131 S. Ct. 770, 785 (2011).  This standard is difficult to meet but "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 131 S. Ct. at 786.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings.  *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct.  A petitioner has the burden

11

of rebutting the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

Finally, when the Texas Court of Criminal Appeals denies relief in a state habeas-corpus application without written order, as in this case, it is an adjudication on the merits, which is also entitled to the presumption of correctness. *See Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[1]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

## V.   Ineffective Assistance of Counsel

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. *See* U.S. CONST. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel, a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient

---

[1]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

12

performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688.  Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance.  *Id*. at 687, 697.

Further, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy.  *Id*. at 668, 688-89.  Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight.  *Id*. at 689.

Finally, the Supreme Court emphasized in *Harrington v. Richter* the way that a federal court is to consider an ineffective-assistance-of-counsel claim raised in a habeas petition subject to AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

131 S. Ct. at 785 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000)).  Accordingly, it is necessary only to determine whether

13

the state courts' rejection of petitioner's ineffective-assistance claims was contrary to or an objectively unreasonable application of *Strickland.* *Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003).

Attorney Danny Duane Pitzer was appointed to represent Petitioner in multiple criminal cases, including the evading-arrest charges relevant to this petition. In his state habeas application, Petitioner alleged counsel was ineffective by (1) failing to present the best viable defense that Petitioner, a cancer patient, was physically and cognitively incapacitated due to his illness and chemotherapy treatments and, thus, unable to drive or commit the offense, (2) erroneously advising Petitioner that the range of punishment he could receive if he were found guilty was 2 to 20 years, (3) failing to conduct a thorough investigation, interview witnesses, or visit the crime scenes, (4) failing to object to an improper "commitment question" – "Why do you think someone would run from the police? – asked by the prosecutor during voir dire, (5) failing to recognize false testimony by Antonio Estrada and Officers Banes and Tyler and impeach them, (6) failing to object to impermissible jury argument by the prosecution, and (7) failing to file a motion for speedy trial at Petitioner's request. (Writ of Habeas Corpus 7-13, Admin. R. ECF No. 13-22.) In support, Petitioner produced, among other things, articles from

various medical publications regarding the side effects of chemotherapy, his own affidavit, and the affidavits of his mother, father, sister, and a friend, wherein they aver that Petitioner suffered serious side effects from his chemotherapy treatments and illegal-drug addiction and as a result was incapable of driving a motor vehicle or outrunning police on foot, that Petitioner had an alibi witness who died days before trial began, that counsel advised them that Petitioner, if convicted, would receive 2 to 20 years, that they were willing and able to testify at trial on Petitioner's behalf, and/or that counsel did not return their phone calls or messages, use the court-appointed investigator, or call Petitioner's doctors or other witnesses to testify. (Affs. 60-68, 76-135, ECF No. 13-22.)

The state habeas judge, who presided at Petitioner's trial,[2] also conducted a hearing by affidavit. Counsel responded to Petitioner's allegations in his affidavit, in relevant part, as follows:

Ground One

Although, Moore eloquently and loquaciously presents to this tribunal a tail of physical and mental deterioration which he alleges would render him incapable of committing the crime with which he was charged, Moore did not make such arguments or reveal such information in his weekly letter to me. Rather, he was more concerned about other charges than the one on which he was tried, and in the course of writing me, revealed other information concerning him being at a friend's house, and

---

[2] Except for voir dire, which was presided over by the Honorable Gene Grant.

his girlfriend taking his car to make a "drug" deal, which left me with the impression that he did, indeed, drive.  When he presented his cancer issues to me, it was concerning his indigence and getting his bond lowered so that he could get out of jail.  During the course of his incarceration, prior to trial Moore never once presented to me, the arguments concerning his inability to drive, walk, run or any of the arguments he now presents.  I certainly would recall that information had he presented it, and would have incorporated it into his defense.  In his correspondence, on more than one occasion, he presents that he was simply walking down the street, with a couple in front of him, when the police drove up and inquired if the couple knew him.  All replied "no", at which time the arresting officer instructed Moore to get on the ground and Moore complied.  He indicated that the fact that he complied with the instructions of the Officer at the time of the arrest, and that he was walking down the street demonstrated that he was not attempting to flee.  Moore never advised me that he could not and did not drive, and therefore, could not have driven the pickup as he was charged with doing.  However, in her testimony, his Mother did establish that he had a car, and she said nothing about him not being able to drive.

The only information concerning his Father that I ever received was a copy of a letter Moore sent to me that his father had sent to him which primarily addresses the bond issues and tends to place responsibility for Moore's actions on him.  The letter does not in any fashion point to his having discussed the oncology issues with a doctor or the name of the doctor, or whether the doctor would testify as Moore asserts in his complaint. I was never given any information concerning any specific doctor, nor was I asked to subpoena a doctor.

Although Moore mentioned his health situation on more than one occasion, mostly through his filings with the Court, he never took the position that he could not have committed the crime with which he was charged due to his health condition.  Indeed, in his complaint while discussing these issues he quotes from his pro se motion filed with the court that "Counsel refuses to consider Defendant's medical and indigency issues as being pertinent to Defendant's defense over all."  Once again, as in all of his correspondence with me, he is tying his medical condition to his indigence primarily in the

context of bonding out.  Moore relied instead on the difference in his appearance at the time he was arrested, rather than the broadcasted description of him.

Ground Two

     When the 8 year offer was made, I discussed at length with Moore that he could receive 25 to life because of all the enhanced and habitual charges which were pending against him, and that the State could try the cases separately and ask that the sentences be stacked.  I urged him to take the 8 years, advising him that he could not afford to gamble because of the potential for stacking.  Moore was only tried on the Evading Arrest-Deadly Weapon Finding with a habitual offender notice, but he had seven other felonies pending, several of which had Habitual Offender notices in them. Moore was well aware of the charges in the indictments, and spoke of them frequently in his letters.

     After the initial offer of 8 years, the offers were all over from 25 to 40 years.  I made Moore aware of the offers and he refused all of them.

     Even if I had believed that the State Jail Felony could not be enhanced above a second degree, I would have erred on the side of caution, and discussed the maximum amount of time that he could have received under the habitual offender notice.  I did discuss this matter with Moore and urged him to seriously consider the 8 year offer because of the seriousness of the multiple charges against him, and his criminal history.

Ground Three:

     Whether or not I interview the state's witnesses is a judgment call on my part with regard to how to try a case.  Most of the time, the state's witnesses are not going to be willing to talk with the Defense, and they are not obligated to do so.  The police report gave a preview of how the officers and State's witnesses would testify.  Contrary to Moore's assertions, I did talk with his mother, sister, and girlfriend on more than one occasion.

     Whether or not Moore was registered at the Motel 6 was irrelevant as was whether or not he was supposed to be on the property.  That would not have, in any way,

17

negated the fact that a person entered into the stolen vehicle parked on that property and drove it away.

It would not have been necessary for me to view the crime scene where the truck wrecked because it out [sic] would have been cleared long before I was appointed to represent Moore, and the Estrada's house and yard were not the relevant points.  Whether Estrada had a detached "garage" or a "shed" as described in the police report were not relevant to the testimony.  Estrada testified that the stairs led out of the "garage" and that Moore was seated on the stairs.  The important and relevant point is that Moore was in the Estrada's backyard, as were the discarded hat and jacket/shirt.

My viewing the crime scene would not have changed my trial strategy.

Ground Four:

The question ("Why do you think someone would run from the police?") asked by the Prosecutor, to which Moore refers, was an open ended question which was not improper.  To object to the question would simply have cemented it in the mind of the potential jurors, and would have accomplished little else.

Ground Five:

Nothing set forth in Moore's complaint establishes "perjury."

A difference between "garage" and a "shed" are immaterial and might constitute a mistake in terminology, but nothing more.  The test is that the witness identified Moore as the person who was sitting on the stairs of a structure (be it a garage or shed) in the witness' back yard on the date and time in question.

Moore complains that the witness "Estrada" testified that Moore was in the garage.  The police report calls the structure "a shed".  However, Estrada actually testified that Moore was sitting on the steps, not <u>in</u> the garage, and for purposes of trial, I did not believe it was important whether it was a garage or a shed.  The witness testified that he was face to face with Moore and identified him both at the time of arrest and at trial, and when he asked Moore what he was doing, Moore told

18

Estrada that he was hiding from the police.  The witness then told Moore to get off his property.

There is no testimony to establish that the clothes (hat and jacket) were found in the lot adjoining the Estrada back yard, but rather Estrada testified that he found the hat and jacket/shirt in his barbeque grill in his back yard, and the pictures that were taken reveal the hat and jacket/shirt to be in the grill.  There was no one but Estrada and the police officers to say otherwise.

Ground Six

Moore asserts that there is no evidence to support the remarks made by the prosecutor in closing argument.[3] As much as I might want to agree with Moore, such is not the case.  Both Mrs. Estrada identified Moore as the person who looked in the window and tried the door handle and the person found by Mr. Estrada sitting on the steps of the structure in his backyard was identified as Moore. Mr. Estrada testified that he asked the person sitting on the steps in his backyard what he was doing, the person said "the cops are looking for me".  Mr. Estrada testified that he found the hat and jacket/shirt in his

---

[3]Specifically, Petitioner complained of the following remarks by the prosecutor:

(1)   "And remember Mr. and Mrs. Estrada, who came back and they told you about the Defendant sitting in their backyard."

(2)   "You know that he was hiding in the backyard where the jacket and the cap were found that matched the description of the person driving the crashed vehicle."

(3)   "And thank God that door was locked, because Ms. Estrada was in there with her baby.  She was in there, just had a C-section, and he would have come right on in had that door not been locked and she would have been defenseless."

(4)   "Defense Counsel chose to put on a case, and they put up his mama.  And you know what? His own mama couldn't say anything good about him.  Couldn't say he couldn't commit this.  He had no friends, no neighbors, no other relatives who could come in here and take this stand and say one good thing about him, nothing."

(Writ of Habeas Corpus 45, Admin. R. ECF No. 13-22.)

19

barbeque grill in his backyard.  While the prosecutor may
have inferred that should Moore have gained entrance to
the dwelling, that Ms. Estrada could have been in danger,
the jury knew what facts had been placed before them in
testimony.  To object to the State's final argument on
the issues presented by Moore, would have re-emphasized
those issues, especially if the Judge overruled the
objection.  The jury knew what evidence it had heard.  It
is not wise to tell them not to look at the white
elephant, which insures that they will do just that.  As
to a failure to call character witnesses in the guilt or
innocense [sic] phase of the trial, counsel is not
required to do so.  I discussed this matter with Moore,
and just as he did not testify because of his criminal
history, to have called character witnesses would have
resulted in the State bringing out all of his criminal
history.  At Moore's request, his mother was called to
establish his physical condition and that it would not be
unusual for him to be out in cold weather in a tank top,
without a jacket.  The Police officers testified as to
what they observed and heard, including the description
of the Defendant.

It is within the purview of the Jury to give weight
to the credibility of a witness.

Ground Seven

. . . His mention in his complaint of a witness[,]
[Robert Earl Jones,] who would have provided him an alibi
was the first I ever heard of this person.  I have
reviewed all of Moore's letters and my notes and this
person was never mentioned to me.  Just as I talked with
his mother, sister, and girlfriend, either I would have
talked with the witness or had the investigator talk with
him, or both of us would have talked with him.  I
certainly would not have ignored a potential alibi for
Moore.  Moore even gave me a list of witnesses, which I
forwarded to the investigator, which did not include
Jones.

Post trial, Moore now produces Affidavits from his
sister, mother, girlfriend and father with information
that was never provided before trial.  He mentions his
alibi, and his relatives and girlfriend all claim to have
called my office and left word with no return calls from
me, yet my records indicate that I did in fact talk with
the mother, sister and girlfriend.  The only contact that

20

I find in my file with regard to his Father is a copy of a letter that Moore sent me that he had received from his Father.  A copy of that letter is attached as Exhibit 2.  The girlfriend actually made an appointment to come into my office, but she rescheduled and did not come in.  In the Affidavit from his mother, she says that she had possession of the jacket and hat, however, Moore conveyed to me orally and in a letter, that his sister had possession of the jacket and hat and was looking for his driver's license.  No one ever asked me, as is implied in the affidavits, to pick up the jacket and hat, but rather, Moore advised me in his correspondence that his sister would be bringing them to my office, but that never happened.  However, from a trial strategy standpoint, I don't believe it would have been something we wanted to present, since that would have further corroborated the description given by the police in their report, and subsequently on the stand.  The hat and jacket were located in the barbeque grill of the eye witness who identified Moore as being the person in the witness' back yard sitting on the steps of a "shed" (in the report) or "garage" (trial testimony).  Estrada further testified that Moore said he "was hiding from the police."

Neither Moore nor the girlfriend [Kimberly Howell with whom he was staying at the time] ever mentioned a note [allegedly written by Petitioner to Howell stating that he had left with Jones to go buy some "go-go" on the night in question] or that she still had the note and neither the note nor a copy of the note was provided to me.  However, the contents of the note as revealed by the Post Trial Complaint and "Affidavits" would simply have put Moore out of the girlfriend's house at the time the alleged theft of the vehicle and ensuing chase occurred.  The only value of the note would have been to place me on notice of the friend with whom Moore allegedly left.  Apparently this friend was not important enough for Moore to bring to my attention independently of his post trial complaint.

COURSE OF REPRESENTATION

. . .

As set forth in the reply above, Moore did mention that he was a cancer patient, in almost every letter he sent to me, which were numerous, and in our conferences,

but it was not until he filed the post-trial complaint to which I am responding, that I ever heard from him or anyone else that he was physically incapacitated at the time of the occurrence of the Evading Arrest case, nor was it mentioned in connection with any other cases. In fact, the information in the Affidavits supplied with the Complaint, talk in terms of him walking several blocks from where his alibi friend waited at a store, which activity would indicate that he was not physically incapacitated at the time. Further, in talking with Moore, I encouraged him to write down all information which he felt was relevant about the course of the events. In that writing which he provided me, he does not mention any physical or mental incapacity.

I did discuss the range of punishment on his cases with him, and did advise him of the severe punishment he could receive because of the many enhanced and habitual charges on several of his cases. I would never have told him that he could not get more than two years, as he has implied, and I did strongly urge him to accept the State's offer of 8 years. Moore simply thought, and as much as told me so many times, that he could beat the charges, so he wanted a trial. When the D.A. told me which case they intended to try first, I told Moore that just the testimony from the civilian witnesses and what I believed the Officers would say was not a good situation for him. Still, he did not give me the information that he has raised post-trial.

None of his relatives told me the information which is set forth now in Affidavits intended to bolster his Application. Keith's sister stated in her affidavit, most of which would be disallowed in trial as heresay, that supposedly Keith's alibi friend left Keith to walk several blocks from where the alibi friend waited, to make a drug buy. The Affidavit from the father, indicating that he tried many times to talk to me, does not comport with my records. While I talked with the sister, mother and girlfriend many times, I did not speak to the Father and the only communication I ever had was a letter which he sent to Moore and Moore sent to me . . . .

Additionally, if any of the relatives, or girlfriend thought that I needed all this information, including the name of the doctor which was never brought up to me, and they couldn't reach me by telephone, they certainly could

have faxed or mailed the information to me.  Certainly, these detailed summaries now being presented for consideration would have been best presented to me in writing, not just verbally, prior to trial so that they could have been pursued.

I do not recall, in my 35 plus years of trying cases, that I have ever refused to issue a subpoena which was requested by my client.  I did not know that there was a doctor that my client wanted subpoenaed, and although we had one conversation concerning the possibility of utilizing a doctor (no name or type), I did advise him that in my experience, doctors say one thing in their office, and when they are subpoenaed and not being paid, their testimony is rarely favorable and is not what they said in the office.  I reiterate that I had none of the information, except the fact that he was a cancer patient and unable to raise bail money, that Moore now presents, but had I had such information, I certainly would have pursued anything that would have been favorable to my client.  The decisions that I made were based upon the information that I had, were strategic in nature and were intended to reach the best outcome for my client.

The strategies employed at time of trial were based upon the information I had been give[n] by Moore.

Based upon 35 plus years of trial experience, and as a matter of trial strategy and tactics, I made decisions concerning what testimony to elicit.  As a practical matter, any one of his relatives who would have testified on behalf of the Defendant would have been decimated by "Have you heard" questions, or as the State did in questioning his witnesses, the State elicited testimony concerning his past criminal behavior.  Furthermore, based upon some of the statements in the Post Trial Affidavits, I might have decided against calling them for fear their testimony was not reliable.

In pre-trial negotiations, I communicated to my client, in a timely manner, all plea bargain offers, explained the same to him, and then communicated his refusal of such offers to the Prosecutor and the Court. On each occasion that offers were communicated, Defendant rejected the offers after a fully informed, intelligent, intentional and freely and voluntarily made independent decision.  As Moore has demonstrated, he has the time and

23

inclination to do research into areas of the law.  It is
my opinion that he, in all probability, researched his
range of punishment for each and every case with which he
was charged.  In any event, as previously stated, I
explained the penalty range for the enhanced and habitual
charges to him, the potential for stacking the punishment
if he was found guilty of the various enhanced and
habitual charges, and urged him early on to accept the 8
year offer.

(Aff. 209-23, Admin. R. ECF No. 13-24 (record references omitted).)

Based on counsel's affidavit, the documentary record, and his

own personal recollections of counsel's actions during the trial

proceedings, the state habeas court adopted the state's proposed

findings of fact, which are consistent with counsel's affidavit or

otherwise supported by the record, and, applying the *Strickland*

standard, recommended that habeas relief be denied.  (Order 272,

Admin. R. ECF No. 13-24.)  Specifically, the state court entered

the following findings of fact:

*Defense*

11.  Applicant testified that he was satisfied with Hon.
     Pitzer's representation.

12.  Applicant presents no affidavits or reports from
     his doctors stating they were contacted by his
     family and were willing to testify but were never
     contacted by counsel

13.  Applicant never advised counsel that his illness
     would have caused him to not be able to commit the
     offense.

14.  Applicant never advised counsel that he was not
     able to drive.

15.  Applicant's recitation of the facts to Hon. Pitzer
     during pre-trial that he walked several blocks
     would indicate that he was not physically

incapacitated at the time of the offense.

16. Applicant's recitation of the facts to Hon. Pitzer did not mention that Applicant was physically or mentally incapacitated.

17. None of Applicant's relatives ever told Hon. Pitzer the information that is now provided in the affidavits.

18. Applicant's father wrote Applicant a letter stating that he would not help him and that Applicant needed to take responsibility for his actions.

19. Applicant's father wrote Applicant a letter stating that the family wanted to be kept informed about his cancer.

20. Applicant's father's letter from April 22, 2008 is inconsistent with his affidavit that he was very involved with Applicant's cancer doctors . . . .

   . . .

22. Applicant's father's letter from April 22, 2008 that Applicant needed to take responsibility for his actions is inconsistent with his affidavit that Applicant was innocent.

23. Applicant's father's affidavit is not credible.

24. Hon. Pitzer was never given any information regarding a specific doctor.

25. Had Hon. Pitzer been provided information regarding Applicant's inability to drive or that his medical issues would have prevented him from committing the offense, Hon. Pitzer would have incorporated it into Applicant's defense.

26. Applicant presents documentation regarding the generic effects of medication and cancer.

27. Applicant presents no medical evidence, reports, statements, or affidavits that he could not have committed the offense due to his medical issues.

28. Hon. Pitzer's representation was not deficient

because he did not present a medical defense on the basis that Applicant never alleged it to him.

*Range of Punishment*

29.  Hon. Pitzer advised Applicant that the punishment range was twenty-five years to life if convicted at trial.

30.  Hon. Pitzer advised Applicant that the State could try all cases separately and ask that sentences be stacked.

31.  Hon. Pitzer advised Applicant to take the State's eight year plea offer.

32.  Hon. Pitzer advised Applicant of the habitual notices in his other pending cases.

33.  Applicant's claim that Hon. Pitzer failed to properly advise him of the range of punishment is without merit.[4]

*Investigation*

34.  Hon. Pitzer filed six discovery motions.

35.  Hon. Pitzer requested, and was appointed, an investigator.

36.  Hon. Pitzer forwarded the investigator a list of witnesses including Applicant's mother, sister, and girlfriend.

37.  Hon. Pitzer did not attempt to contact the State's witnesses because he did not believe (1) that they would be willing to talk to him and (2) they would give information different than what was provided in the police report.

38.  Hon. Pitzer spoke with Applicant's mother, sister, and girlfriend on more than one occasion.

---

[4]Petitioner directs the Court to the fact that counsel agreed with the trial court that he "didn't think you could enhance a state jail felony up above a second degree felony." (Reporter's R., vol. 2, 3, ECF No. 13-14.) This fact alone however is not clear and convincing evidence refuting counsel's testimony that he advised Petitioner of the correct range of punishment.

39. Hon. Pitzer did not look to see if Applicant was registered at Motel 6 because it was irrelevant to whether he was supposed to be on the property because it would have been negated by the fact that he entered a stolen vehicle.

40. Hon. Pitzer did not view the crime scene because the scene was cleared long before he was appointed.

41. Hon. Pitzer did not view the Estrada's home because whether they had a garage or shed was irrelevant to the fact that Applicant was found on the stairs of that structure.

42. Hon. Pitzer concluded the important information was that Applicant was discovered in the Estrada's backyard as were his clothing.

43. Hon. Pitzer had concluded that viewing the crime scenes would not have changed his trial strategy.

44. Hon. Pitzer's strategies and investigation was [sic] based on the information supplied by Applicant.

*Voir Dire*

45. Hon. Pitzer did not object to the voir dire question because it was open ended and proper.

46. The question, "why do you think someone would run from the police?" is not a commitment question.

47. Applicant's claim that Hon. Pitzer should have objected to the question is without merit.

*Perjury*

48. Applicant presents no evidence to support his claim that witnesses committed perjury or testified falsely.

49. Applicant alleges the witnesses testified inconsistently.

50. Hon. Pitzer did not object to the testimony because it [sic] did not find that it was false or perjury.

27

51. Applicant's claim that the State presented perjured and false evidence is without merits.

*Jury Arguments*

52. The State's remark that the Estrada's [sic] testified that Applicant was in their backyard was a proper summation of the evidence.

53. The State's remark that Applicant was hiding in the same backyard that the clothing was found was a proper summation of the evidence.

54. The State's remark that Applicant would have come in the Estrada's home if the door hadn't been locked was a proper summation of the evidence because he tried the door handle.

55. The State's remark that Applicant's defense was only his mother as a character witness was in answer to opposing counsel's argument that the State failed to prove their case.

56. The evidence against Applicant was overwhelming.

57. There is no evidence that Applicant was harmed by counsel's failure to object to the State's remark regarding his mother as his only witness.

(Writ of Habeas 262-66, Admin. R. ECF No. 13-24.)

Based on its findings, and applying the *Strickland* standard and relevant federal and state law, the state court entered the following legal conclusions:

7. Applicant has failed to prove that he provided Hon. Pitzer with his "medical" defense.

8. Applicant has failed to present any credible evidence that he could not have committed the offense due to his medical issues.

9. Applicant has failed to prove that counsel's representation was deficient because he did not present a "medical" defense.

28

10.   Counsel properly advised Applicant of the range of punishment.

11.   Applicant has failed to prove that counsel's investigation constituted deficient representation.

12.   Applicant has failed to prove that the State asked an improper commitment question.

13.   Applicant has failed to prove that counsel should have objected to the State's voir dire.

14.   The State may not obtain a conviction through the knowing use of perjured testimony.

15.   Knowingly using perjured testimony amounts to prosecutorial misconduct.

16.   To prove that the State knowingly used perjured testimony, the test is (1) the testimony must be false; (2) the State's use must be knowingly; and (3) there is a reasonable likelihood that the false testimony could have affected the judgment of the jury.

17.   Inconsistent testimony goes to the credibility of the State's witnesses and does not establish the use of perjured testimony.

18.   Applicant has failed to prove that the State presented perjury and false evidence.

19.   Applicant has failed to prove that counsel should have objected to the State's evidence.

20.   To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, or (4) plea for law enforcement.

21.   The State's remark that Applicant only presented his mother as a witness was an objectionable comment.

22.   Even though the comment was objectionable, counsel's failure to object to it is not an act

that falls below the objective standard of reasonableness.

. . .

25. Applicant has failed to prove that his trial counsel's representation fell below an objective standard of reasonableness.

26. A party fails to carry his burden to prove ineffective assistance of counsel where the probability of a different result absent the alleged deficient conduct sufficient to undermine confidence in the outcome is not established.

27. Applicant has failed to show that there is a reasonable probability that the outcome of the proceeding would have been different had counsel conducted more investigation, investigated more witnesses, or visited the crime scene.

28. In light of the overwhelming evidence against Applicant, Applicant has failed to show that there is reasonable probability that the outcome of the proceeding would have been different had counsel objected to the State's remark that he only put on his mother to testify for him.

. . .

30. Applicant has failed to show that there is a reasonable probability that, but for the alleged acts of misconduct, the result of the proceeding would have been different.

31. Applicant has failed to prove that he received ineffective assistance of trial counsel.

(*Id.* 167-69, Admin. R. ECF No. 13-24.)

The Texas Court of Criminal Appeals denied relief based on the habeas court's findings without a hearing. (*Id.* cover, ECF No. 13-22.) Petitioner has failed to rebut the state court's findings of fact by clear and convincing evidence; thus, the findings,

30

including the court's credibility findings, are entitled to the presumption of correctness. 28 U.S.C. § 2254(d)(2); *Miller-El v. Cockrell,* 537 U.S. 322, 240 (2005). Deferring to those findings, and having independently reviewed petitioner's claims in conjunction with the state-court records, it appears that the Supreme Court has not specifically addressed one or more of the claims raised by Petitioner or that, where the Supreme Court has done so, the state courts' application of *Strickland* was not objectively reasonable. *See, i.e., Lopez v. Smith,* — S. Ct. —, 2014 WL 4956764, at *3 (U.S. Oct. 6, 2014) (No. 13-946) (providing absent a decision by the Supreme Court addressing "the specific question presented by a case" a federal court cannot reject a state court's assessment of claim); *Burt v. Titlow,* 134 S. Ct. 10, *17 (2013) (noting the absence of evidence cannot overcome the presumption that counsel's conduct fell within wide range of reasonable professional assistance); *Gonzalez v. United States,* 553 U.S. 242, 249 (2008) (providing tactical decisions generally controlled by counsel include "the objections to make, the witnesses to call, and the arguments to advance"); *Strickland,* 460 U.S. at 689 (holding strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for post-conviction relief on the grounds of ineffective assistance of counsel); *Alvord v . Wainwright,* 469 U.S. 956, 960 n.5 (1984) (holding decision on what witnesses to call is "the exclusive

province of the lawyer").

Petitioner's claims lack a legal and/or a credible evidentiary basis and Petitioner has not demonstrated any reasonable probability that the outcome of his trial would have been different but for counsel's acts or omissions, and the evidence of his guilt is overwhelming. A petitioner shoulders a heavy burden to overcome a presumption that his counsel's conduct is strategically motivated, and to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir. 1985). Petitioner has presented no credible evidentiary, factual or legal basis in this federal habeas action that could lead the court to conclude that the state courts unreasonably applied the standards set forth in *Strickland* based on the evidence presented in state court. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to relief.

## VI.  Conclusion

Based on the record before the Court, the state courts' rejection of Petitioner's claims is not contrary to, nor involve an unreasonable application of, clearly established federal law as established by the Supreme Court nor was the decision based on an unreasonable determination of the facts in light of the evidence presented in the state court.

For the reasons discussed, the Court DENIES Petitioner's

petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and DENIES a certificate of appealability.

SIGNED October 22, 2014.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE